[No. 38291.    Department Two.    November 3, 1966.]

THE STATE OF WASHINGTON, *Respondent*, v. MARIEA WATSON, *Appellant.**

*Reported in 419 P.2d 789.

---

*Farris, Bangs & Horowitz,* by *Gerald L. Bangs,* for appellant.

*Charles O. Carroll* and *Robert E. Dixon,* for respondent.

FINLEY, J.—The appellant, Mrs. Mariea Watson, was tried on a charge of first degree murder in King County Superior Court. The jury found her guilty of the lesser included crime of manslaughter. Now here on appeal and seeking a new trial, her four assignments of error raise the following three issues: (1) whether it was an abuse of discretion for the trial court to refuse to grant a second continuance for defense counsel to attempt to produce an alleged key witness; (2) whether the trial court erred in refusing to give an instruction requested by the defendant, cautioning the jury not to consider the failure of the defense to produce the missing witness after such witness had been mentioned in the opening statement of defense counsel; and (3) whether a criminal defendant, as a matter of right, is entitled to a preliminary hearing. Our consideration of the first two issues is dispositive of this appeal.

The defendant, a small woman, forty years of age, owns and operates the Flames Olympus Hotel in Seattle, Washington, where she lives in an apartment-office. Her husband, John D. Watson, Jr., is a United States Coast Guardsman. He was either sailing with the *Northwind,* a ship based in Seattle, or was stationed in Texas at the time the events in this case transpired. The decedent, one Clifford L. Lee, had been a resident of the Flames Olympus Hotel, and he and appellant had engaged in intimate relations during the summer and early fall of 1964. The termination of these relations, primarily as a result of the actions of the appellant, apparently outraged Mr. Lee. He attempted to force his attentions on her and, upon at least one occasion, physically abused her. He continually made threats about killing Mrs. Watson, both to third parties and to the defendant personally.

During the morning of January 23, 1965, Mrs. Watson had been apprised by several telephone calls that Mr. Lee was under the influence of intoxicants and was threatening to kill her. Testifying in her own behalf at the trial, she readily admitted that, with this information in mind, she left the hotel to purchase a gun for her protection. While Mrs. Watson was engaged in this project, Mr. Lee had gone to the Flames Olympus. There, in a room down the hall on the main floor of the hotel, he continued drinking and periodically threatening Mrs. Watson's life. During the course of several ensuing confrontations between the defendant and Mr. Lee, he again threatened to kill her. When Mrs. Watson came out of her room to use the telephone (which was in the hall between her room and the room where Mr. Lee had been imbibing), he came down the hall toward her, saying (according to the testimony of Mrs. Watson): "Oh, now, don't talk to me, bitch. I am going to kill you. . . . You got to die today." Thereupon, Mrs. Watson retreated to her apartment, with Mr. Lee in pursuit. Mrs. Watson seized the weapon which she had purchased that morning. While she was attempting to close the door between the office and her apartment, she shot and fatally wounded Mr. Lee.

Apparently, the investigating police officers and the prosecutor were dubious about the above story which was substantiated mainly by the testimony of Mrs. Watson. At any rate, she was charged by information with the crime of first degree murder and was convicted of the lesser included offense of manslaughter.

Mrs. Watson's defense at the trial was that she had been justified in using a deadly weapon in self-defense because she had been in reasonable apprehension of grievous bodily harm or death. The crucial point of the defense, in terms of persuading the jury, was to justify Mrs. Watson's fear for her life. There is ample unrefuted testimony in the record to the effect that Clifford L. Lee (6 feet 5 inches tall, weighing approximately 200 pounds) was a physically violent man, and that he had made continual threats on the defendant's life after the cessation of

their intimate relations. But the record is somewhat sketchy as to whether Mr. Lee had the apparent means to carry out his threats at the time of his death. As to her first confrontation with Mr. Lee in the hotel on the day of his death, Mrs. Watson testified:

But Slim [Mr. Lee] was talking in the hall and talking very loud. I could hear him very clear. Q. What was he saying? A. He said, "I am going to kill that bitch today." And he did say it. Fuller said to him, "Oh, don't kill nobody today. Come on." He said, "It's got to be today." And he did have a knife. The first time he came out and Fuller took him back in there. But he didn't get too far from the door, because I was looking out my office, there. That's when I went back in. Q. Did you see the knife at the time he came up the first time? A. I could see the knife, that's when Fuller took him back. Q. Do you remember what kind of a knife it was? A. I think it was a big knife. Q. Was it as big as Defendant's Exhibit Number 24? A. As big as that.

Without engaging in undue speculation as to what might have been the pivotal points of the defense as far as the jury was concerned, it seems obvious that testimony of the defendant, perhaps corroborated by eyewitnesses, to the effect that Clifford L. Lee was armed with a knife at the time he was shot would have been crucial to the defense. Mrs. Watson's testimony in this respect is not too explicit:

Q. What did you notice about Slim [Mr. Lee] as he came up the hall? A. He had his hands down by him, something like that, and I don't know if I saw anything or not. *I do remember him holding his hand funny— down by his side, and I just had that knife in mind. I thought he still had that knife.* (Italics ours.)

Depending upon its impressions as to the creditability of Mrs. Watson's testimony, the jury could have concluded the facts were such (a) that Mr. Lee was armed with a deadly weapon when he pursued Mrs. Watson into her apartment and office; or, (b) as seems probable in view of the verdict rendered, that Mrs. Watson was not in reasonable apprehension of grievous bodily harm or death.

Defense counsel for Mrs. Watson apparently was convinced that he could bolster her testimony about the knife by the testimony of the alleged eyewitness, one Edward Collins. By affidavit dated April 14, 1965, Richard N. Brown, a private investigator hired by the defendant, indicated that he had contacted Mr. Collins shortly after the shooting:

Mr. Collins related to me that he and a lady friend had just descended the stairs down to the main floor, when he saw the now deceased, Clifford L. Lee, known to him as "Slim," charging toward the defendant, Mariea Watson, who was standing in the area near the hall telephone . . . . He noticed that "Slim" had a butcher knife in his hand.

Mr. Collins apparently told Mr. Brown that he was willing to be a witness for Mrs. Watson, but that he could not stay in Seattle because he was afraid for his own safety. The trial was originally set for April 15, 1965, but a continuance was granted for the purpose of locating and serving a subpoena upon Mr. Collins. Ostensibly, Mr. Brown had encountered considerable difficulty in keeping track of Mr. Collins. The record is unrefuted to the effect that counsel for the defendant, acting through his investigator, Mr. Brown, was diligent in trying to locate Mr. Collins prior to the date of the original trial. In any event, Mr. Collins was found and served in Seattle on April 19, 1965.

On April 21, 1965, Mr. Brown once again personally located Mr. Collins and informed him that he was to be at the trial at 9:30 a.m., on April 22, 1965. Although Mr. Collins indicated that he still had qualms about his own personal safety and was somewhat reluctant to testify because of his past record, he did promise to be at the trial. Even though Mr. Collins was not in the courtroom at the appointed time, defense counsel emphasized, in his opening statement to the jury, the crucial nature of the testimony Mr. Collins was expected to give. The court took evidence until approximately 9 p.m., on April 22, 1965. At the commencement of trial on the following day, the trial judge was informed of the absence of Mr. Collins, and a bench warrant was issued. Since Mr. Collins was not found im-

mediately, defense counsel moved for a continuance in order to locate Mr. Collins—characterized as his "key" witness. As indicated hereinbefore, the motion was denied. Similarly, defense counsel's request for an explanatory instruction to the jury, cautioning them not to consider the absence of the witness in their deliberations, was also denied.

We think that the trial judge's refusal to grant a continuance, with the added failure to give a cautionary instruction, is reversible error and entitles the defendant-appellant to a new trial. Article 1, § 22, of the Washington State Constitution, as amended, reads in pertinent part as follows:

> In criminal prosecutions the accused shall have the right . . . to have compulsory process to compel the attendance of witnesses in his own behalf . . . .

That constitutional guarantee is statutorily implemented by RCW 10.46.080, which provides:

> Continuances. A continuance may be granted in any case on the ground of the absence of evidence on the motion of the defendant supported by affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to procure it; and also the name and place of residence of the witness or witnesses; and the substance of the evidence expected to be obtained, and if the prosecuting attorney admit that such evidence would be given, and that it be considered as actually given on the trial or offered and overruled as improper the continuance shall not be granted.

■ Of course, the granting of continuances is a matter which should rest largely within the sound discretion of the trial court. However, reliance on the trial judge in this respect is not absolute and without some qualifications:

> While the matter of granting continuances because of the absence of witnesses is largely within the sound discretion of the trial court, and, as a general proposition, its ruling will not be disturbed except in cases where manifest injustice has resulted, yet it is the duty of appellate courts to reverse such rulings in cases where a fair trial has been denied. *State v. Musselman*, 101 Wash. 330, 339, 172 Pac. 346 (1918).

One of the most basic constitutional protections afforded a criminal defendant is the right to have witnesses appear in his behalf. Article 1, § 22, of the Washington State Constitution. The record amply demonstrates the materiality and the possible impact of the evidence which Mr. Collins was expected to give. In fact, it can reasonably be said that Mr. Collins potentially was the key witness to Mrs. Watson's defense.

In view of the foregoing, we are persuaded that it was an abuse of discretion for the trial judge to refuse to grant a second continuance. In this connection we point out again that there is nothing in the record to indicate that counsel was attempting to delay unduly the trial, or that counsel was not diligent in his efforts to secure Mr. Collins' presence at the trial. It seems somewhat unusual, to say the least, that the entire trial in this prosecution for first degree murder required only approximately a day and one half of court time. There is also some indication in the record that the trial judge was pressing counsel closely to expedite and to finish trial prior to the week-end court recess. While efficient and expeditious administration of justice is, of course, a most worthwhile objective, the defendant's rights must not be overlooked in the process through overemphasis upon efficiency and the conservation of the time of the the court.

The defendant is entitled to a new trial.

ROSELLINI, C. J., DONWORTH and WEAVER, JJ., and LANGENBACH, J. Pro Tem., concur.